**Affirmed and Memorandum Opinion filed March 16, 2021.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-19-00901-CV

---

## MELISA SYLVESTER, Appellant

## V.

## BJORN M. NILSSON, Appellee

---

**On Appeal from the 280th District Court
Harris County, Texas
Trial Court Cause No. 2019-34043**

---

## M E M O R A N D U M   O P I N I O N

Appellant Melisa Sylvester appeals a protective order issued in connection with her divorce from appellee Bjorn M. Nilsson. Sylvester argues that the order should be set aside because (1) it allegedly conflicts with a mediated settlement agreement filed in the divorce proceeding and (2) legally and factually insufficient evidence supports the trial court's findings that she committed family violence in the past or that she is likely to commit family violence in the future. Sylvester also challenges the trial court's award of attorney's fees to her husband, Nilsson.

Because we conclude that the trial court did not err in issuing the protective order or in awarding attorney's fees to Nilsson, we overrule Sylvester's issues and affirm the trial court's order.

## Background

Sylvester and Nilsson met while living in Malaysia. The couple married there in 2014, and Sylvester later gave birth to a son. In summer 2017, the family moved to Texas, where the couple's daughter was born.

In December 2018, Nilsson filed for dissolution of the marriage and also applied for a protective order against Sylvester (the "First Application"). The divorce matter was filed in the 311th District Court and assigned cause number 2018-90428. The First Application was filed in the 280th District Court and assigned cause number 2018-90703.

In January 2019, the parties signed a Mediated Settlement Agreement ("MSA") as part of their divorce case. In the MSA, Nilsson agreed "to pass the protective order hearing currently set in the 280th District Court for 1/7/19 and to concurrently non-suit said protective order suit within 5 days from today." Consistent with the MSA terms, Nilsson filed a notice of non-suit without prejudice in cause number 2018-90703. The MSA also stipulated that Nilsson was to be sole managing conservator for the children, and Sylvester was to have supervised visitation.

According to Nilsson, shortly after the parties agreed to the MSA and Nilsson non-suited his First Application, Sylvester filed documents in the divorce proceeding to have the MSA set aside and to obtain primary custody of the children, despite the parties' agreement in the MSA that Nilsson was to have primary custody.

2

Sylvester's attempts to set aside the MSA prompted Nilsson to again apply for a protective order on his behalf and on behalf of the couple's two children (the "Second Application"), in May 2019. This application, the ruling on which forms the basis of today's appeal, was filed in the 280th District Court and assigned cause number 2019-34043.

In the Second Application, Nilsson asserted that Sylvester had committed family violence and child abuse. Nilsson attached a supporting declaration, in which he contended that: Sylvester threatened to kill Nilsson, threatened to kill the couple's daughter, and stated that "she"[1] would be better off dead; Sylvester has a history of alcohol abuse, rendering her incapable of taking care of herself or the children; the couple's son, while in Sylvester's control, ran into traffic (but was not harmed); and Nilsson feared for his children's safety if Sylvester had sole possession of the children.

Nilsson also described in his declaration two specific acts of family violence.[2] In the first instance, which we refer to as the "December 6 incident," Nilsson attended a work function in the evening but returned home in response to Sylvester's text messages, in which she stated "that the children will die if [Nilsson] [did] not come home." At home, Nilsson found Sylvester intoxicated and the children screaming. Sylvester became verbally and physically aggressive toward Nilsson, threatening to stab him to death with a knife and stating that "as a doctor she knows where to strike to hit critical arteries." "Without warning," Sylvester bit Nilsson's upper arm and then hit him with her fist, grabbed and

---

[1] It is unclear from Nilsson's declaration whether Sylvester was referring to herself or to her daughter.

[2] Nilsson testified in greater detail regarding these instances during the protective order hearing, which we describe *infra* in Section B of the Analysis.

3

scratched him, threw furniture at him, and hit him "with wooden candles . . . causing heavy bruising."

In the second instance, which we refer to as the "December 12 incident," Sylvester came home in the early morning hours, "heavily intoxicated," and "attempted to strike [Nilsson] with [a] clenched fist in the head." Sylvester began shouting and screaming, awakening the children. According to Nilsson, Sylvester "started cursing our daughter calling her a bitch and told me that I should have sex with my daughter." Sylvester continued to attempt to hit Nilsson and the daughter, began to throw furniture at Nilsson, and threatened to kill Nilsson and the daughter. Police eventually arrived at the couple's home and, after speaking with Nilsson, arrested Sylvester.

Stemming from the December 12 incident, the State sought and obtained a Magistrate's Order for Emergency Protection, which Nilsson attached to his Second Application. The magistrate's order stated that Sylvester had been arrested for an offense involving family violence and prohibited Sylvester from threatening or harassing Nilsson or going to or near Nilsson's residence or workplace.[3]

Based on this evidence, Nilsson sought a protective order prohibiting, among other things, Sylvester from communicating with Nilsson or the children or coming within 400 feet of Nilsson's home or work or the children's school or childcare facility.

In her response, Sylvester contended that Nilsson's Second Application was false and misleading. Sylvester also asserted that Nilsson had been the perpetrator of family violence against Sylvester and that, if Sylvester committed violence against Nilsson, it was committed solely in self-defense. According to Sylvester,

---

[3] According to Nilsson, the charges against Sylvester were dismissed approximately seven months later.

4

she "was tricked into signing the MSA," but she otherwise did not refer to the terms of the MSA. Sylvester attached police records documenting a complaint made by Sylvester against Nilsson. Two days after the December 12 incident, Sylvester called the police and complained that Nilsson had strangled her. The district attorney declined to accept charges from this matter "due to the complainant's lack of credibility." (Capitalization normalized).

Sylvester filed her own application for protective order against Nilsson, also filed in the 280th District Court and assigned cause number 2019-35529.

The trial court held a hearing on the competing applications, at which Nilsson, Sylvester, and Sylvester's father testified regarding the merits. At the conclusion of the hearing, the trial court granted Nilsson's Second Application and denied Sylvester's application. The trial court found that family violence had occurred, specifically that Sylvester committed family violence, and that family violence is likely to occur in the future. The trial court found that the protective order was necessary for the safety and welfare of, and in best interest of, Nilsson and his two children and was necessary for the prevention of family violence. The trial court awarded Nilsson his attorney's fees incurred in prosecuting the Second Application, to be recovered from Sylvester.

Sylvester appeals.

## Standard of Review

When the trial court is the factfinder, such as when it determines whether to issue a protective order, we review the evidence supporting the protective order under both legal and factual sufficiency standards. *Shoemaker v. State for Prot. of C.L.*, 493 S.W.3d 710, 714-15 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (citing *In re Doe*, 19 S.W.3d 249, 253 (Tex. 2000); *Vongontard v. Tippit*, 137

S.W.3d 109, 112 (Tex. App.—Houston [1st Dist.] 2004, no pet.)); *see also Lopez v. Occhiogrosso*, No. 14-17-00324-CV, 2019 WL 347336, at *4 (Tex. App.—Houston [14th Dist.] Jan. 29, 2019, no pet.) (mem. op.).

In a legal sufficiency review, we view the evidence in the light most favorable to the finding and indulge every reasonable inference that supports the challenged finding, crediting favorable evidence if a reasonable fact finder could and disregarding contrary evidence unless a reasonable fact finder could not. *Shoemaker*, 493 S.W.3d at 715 (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005)). "'If there is any evidence of probative force to support the finding, i.e., more than a mere scintilla, we will overrule the issue.'" *Id.* (quoting *City of Houston v. Hildebrandt*, 265 S.W.3d 22, 27 (Tex. App.—Houston [1st Dist.] 2008, pet. denied)).

In reviewing for factual sufficiency, we consider all the evidence; we will set aside a finding only if it is so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Id.* (citing *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996); *Kroger Co. v. Persley*, 261 S.W.3d 316, 319 (Tex. App.—Houston [1st Dist.] 2008, no pet.)).

"The factfinder is the exclusive judge of which facts have been proven, which witness is credible, and the weight to be given any witness's testimony." *Id.* Thus, when faced with conflicting evidence, the factfinder may believe one witness and disbelieve others. *Id.* (citing *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986)).

With these familiar standards in mind, we turn to each of Sylvester's appellate contentions.

6

**Analysis**

**A.      Alleged Conflict between MSA and Protective Order**

In her first issue, Sylvester argues that the protective order should be set aside because it is inconsistent with the MSA, which the parties signed as part of the separate divorce proceeding.  In the argument section of her brief, Sylvester does not specifically identify which portions of the MSA conflict with the trial court's protective order.  Sylvester simply states that "[t]he MSA requires [Nilsson] to dismiss his application for protective order and awards [Sylvester] temporary access to the children until a final decree can be entered."  From this, we gather that Sylvester contends that the MSA prohibited Nilsson from seeking, or a trial court from granting, a protective order and that the protective order and the MSA contain conflicting terms regarding Sylvester's access to the children.

Sylvester did not present these arguments to the trial court in opposition to Nilsson's Second Application for a protective order.  In her response, Sylvester substantively argued only that Nilsson's application was false and misleading and that Sylvester had been the victim, not the perpetrator, of family violence.  We also see nothing in the hearing transcript where Sylvester brought these arguments to the trial court's attention.  We conclude that Sylvester failed to preserve the complaints she now raises on appeal.  *See* Tex. R. App. P. 33.1(a); *Wallace v. McFarlane*, No. 01-10-00368-CV, 2013 WL 4507843, at *5 (Tex. App.—Houston [1st Dist.] Aug. 22, 2013, no pet.) (mem. op.) ("In order to preserve error, the party's complaint on appeal must comport with the argument it raised in the trial court."); *see also In re M.E.H.*, ---S.W.3d---, 2020 WL 1942430, at *11 (Tex. App.—Houston [14th Dist.] 2020, no pet.).

After the trial court signed the final protective order, Sylvester filed a "Motion for Entry of Judgment," in which she asserted that she had the "right to

7

rely on the mediated settlement agreement which non-suited any protective order." At most, this document raises Sylvester's contention that the MSA prohibited Nilsson's Second Application. Even assuming that this bare assertion was sufficient to preserve error, Sylvester's argument still fails. Pursuant to the MSA, Nilsson agreed to non-suit his First Application: "Petitioner agrees to pass the protective order hearing currently set in the 280th District Court for 1/7/19 and to concurrently non-suit said protective order suit within 5 days from today." The record reflects that he did so. Nilsson later filed the Second Application, which the trial court granted. No provision in the MSA prohibited Nilsson's Second Application or otherwise barred him from seeking such relief in the future should he believe circumstances warranted it.

We overrule Sylvester's first issue.

## B. Evidentiary Sufficiency

In her second issue, Sylvester challenges the evidentiary sufficiency of the trial court's findings supporting the protective order.

The Texas Family Code permits victims of family violence to apply for a protective order. *See* Tex. Fam. Code §§ 82.001-.002. "A court shall render a protective order . . . if the court finds that family violence has occurred and is likely to occur in the future." *Id.* § 81.001. "Family violence" includes:

> an act by a member of a family or household against another member of the family or household that is intended to result in physical harm, bodily injury, assault, or sexual assault or that is a threat that reasonably places the member in fear of imminent physical harm, bodily injury, assault, or sexual assault, but does not include defensive measures to protect oneself.

8

*Id.* § 71.004(1). We begin by considering whether Nilsson presented more than a scintilla of evidence to support the trial court's findings, keeping in mind that we view the evidence in the light most favorable to the trial court's order.

Nilsson began his testimony by broadly describing instances when Sylvester hit him in the chest with her fist, causing him a "little bit" of pain. According to Nilsson, such incidents occurred "two, three times a week . . . maybe not as severe but sometimes more severe, sometimes less severe." Nilsson then testified in detail regarding the "two main incidents that led to [him] filing [his] application"—i.e., the December 6 and December 12 incidents.

On December 6, 2018, Nilsson attended a work dinner. Shortly after arriving, he began receiving "[e]xtremely concerning" text messages from Sylvester—including a message that "your daughter is about to die"—so he left early and returned home. When he arrived home, he found the children crying and Sylvester "heavily intoxicated" from drinking half of a bottle of whiskey. According to Nilsson, Sylvester was "behaving aggressively and she was obviously intoxicated." Nilsson attempted to soothe their daughter, and "then almost immediately, the situation escalate[d] into violence." Nilsson testified that Sylvester "start[ed] to throw furniture and she [took] some blunt objects to hit [Nilsson]. She bit[] [him] in [his] upper left arm, which [left] a large bruise . . . . And it [was] an ongoing very dangerous situation." Nilsson said that he "sustained heavy bruises and bleeding to [his] left arm because of being struck by blunt objects." Specifically, Nilsson said that Sylvester threw the "baby cot . . . some candle lights . . . [and] some potted plants," and that Sylvester bit him on his upper arms.

On December 12, 2018, Nilsson came home after work. The family ate dinner and "then around 7:00 o'clock, [Sylvester] left [the] apartment without

9

stating where she would go," not returning until "between 1:00 and 1:30 a.m. in the morning." Nilsson said she was "heavily intoxicated and visibly angry." According to Nilsson, he and Sylvester "sat down at the dinner table and almost immediately she punched [him] in the head." Nilsson testified that his daughter woke up, and he went to get her. When he came back into the kitchen carrying his daughter, Sylvester "grabbed [the daughter's] arm and pulled it hard and at a later moment, she tried to punch [the daughter] in the head with [a] closed fist." Nilsson said that he "decide[d] to try to leave the apartment and see if that . . . will make [Sylvester] calm down." He walked around the apartment complex until Sylvester texted him "that the police had arrived and [he] should come back to the apartment."[4] The police arrested Sylvester that night.

Each of these incidents, standing alone, is some evidence of family violence. *See Puente v. Puente*, No. 01-18-00583-CV, 2019 WL 3418510, at *5 (Tex. App.—Houston [1st Dist.] July 30, 2019, no pet.) (mem. op.) (testimony that respondent "assaulted" applicant, which caused bruising, and audio recording in which respondent "told [applicant] that it would be necessary for him to beat her if she failed to discipline the [children] as he wished" was evidence supporting trial court's finding of family violence); *see also Coffman v. Melton*, 448 S.W.3d 68, 74 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (applicant's testimony regarding respondent's past acts of family violence, which included him spitting on, cursing at, and physically abusing her, held sufficient to support trial court's protective order); *Boyd v. Palmore*, 425 S.W.3d 425, 430 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (blocking car and jumping on its hood legally sufficient evidence of family violence despite lack of physical harm). Thus, the evidence is

---

[4] Nilsson and Sylvester both testified that they did not know who called the police.

legally sufficient to support the trial court's finding that Sylvester committed family violence.

Nilsson further testified that, during the December 6 altercation, Sylvester "threaten[ed] to kill [him]. Threaten[ed] to use her skills as a doctor to injure [him]." Nilsson said he feared that Sylvester would follow through on those threats, because she was "making very specific threats about how to kill [him]." Nilsson also stated:

> She has made numerous threats to kill me and to stop me, to use her medical knowledge and she has been standing in our bedroom with a kitchen knife in her hand while I've been lying in the bed. She has, to my knowledge, not admitted or recognized her behavior in any way. She has had a history of alcohol consumption when she has become uncontrollable and not being able to control herself. My fear is that this can happen again and that would result in physical violence.

We conclude that the evidence is also legally sufficient to support the trial court's finding that Sylvester is likely to commit family violence in the future. *See Puente*, 2019 WL 3418510, at *5 (evidence that respondent's behavior escalated over time and that applicant moved out of marital home because of fear of respondent, viewed in conjunction with evidence of past family violence, would allow a reasonable factfinder to conclude that future family violence was likely); *Boyd*, 425 S.W.3d at 432 (single act of past family violence may be legally sufficient to support finding that future family violence was likely).

The record does contain some contrary evidence, which we consider in our factual sufficiency review. Nilsson admitted that, during the December 6 incident, he "gave [Sylvester] a push and [] also kicked her left leg" while Sylvester "was attacking" him. Nilsson characterized this as an attempt to defend himself and his daughter, who he held in his arms at the time. Similarly, when asked whether he

11

ever hit Sylvester, Nilsson testified that he "defended [himself] on three occasions" by pushing, kicking, or grabbing Sylvester.

Sylvester denied that Nilsson was defending himself on December 6; in her opinion, "[h]e was attacking me." Regarding the December 12 incident, Sylvester did not deny threatening to kill Nilsson, but she tried to explain: "It always start[s] with me trying to speak about something and I'm not heard. And at that point, the anger just builds up between both of us. And we never really get down to the root of problem, it's always piled up." Sylvester introduced pictures purportedly showing "the injuries from [December] 6th and re[-]injury from the 12th," including "the spot where [Nilsson] kicked [her] and [she] was bleeding and it turned to be a scab."

Sylvester also testified that Nilsson strangled and kicked her when the couple lived in Malaysia, that Nilsson kicked her in the stomach while Sylvester was pregnant with the couple's daughter, that Nilsson was "a batterer," and that Nilsson once punched the couple's son in the eye. Sylvester's father corroborated some of Sylvester's testimony, stating that Nilsson strangled Sylvester in Malaysia and kicked Sylvester's stomach while she was pregnant, although the father admitted that he did not personally witness the latter incident. Finally, according to Sylvester, she took a class called "Aid of Victim of Domestic Violence," in which Sylvester learned about "the cycle of violence as in how to avoid the red flags in a relationship."

As factfinder, the trial court was entitled to assess the respective credibility of the witnesses and to credit Nilsson's testimony over Sylvester's or her father's. *See, e.g.*, *Wilkerson v. Wilkerson*, 321 S.W.3d 110, 117 (Tex. App.—Houston [1st Dist.] 2010, pet. dism'd) (trial court as factfinder could believe applicant for protective order even though respondent hotly contested facts). Having reviewed

the record as a whole, we are not convinced that the trial court's findings as to past and future family violence are against the great weight and preponderance of the evidence. The evidence is therefore factually sufficient to support these findings. *See Boyd*, 425 S.W.3d at 433 (evidence factually sufficient to support protective order, notwithstanding respondent's denials and explanations as to his behavior); *see also Puente*, 2019 WL 3418510, at *5.

We overrule Sylvester's second issue.

## C. Attorney's Fees

Family Code section 81.005 grants the trial court discretion in awarding attorney's fees to an applicant who successfully obtains a protective order against a party who is found to have committed family violence:

> The court may assess reasonable attorney's fees against the party found to have committed family violence or a party against whom an agreed protective order is rendered under Section 85.005 as compensation for the services of a private or prosecuting attorney or an attorney employed by the Department of Family and Protective Services.

Tex. Fam. Code § 81.005(a).

The trial court found Sylvester committed family violence, issued the protective order, and awarded Nilsson $45,179.84 in attorney's fees. In her third issue on appeal, Sylvester challenges the fee award, arguing that: (1) the fees are unreasonable as a matter of law; (2) the fees were not segregated from work for which fees are unrecoverable; (3) the trial court failed to consider Sylvester's ability to pay; (4) the judgment allows for a double recovery of fees; and (5) the fee award should be reversed if the protective order itself is set aside. We address each contention in turn.

13

1. *Reasonableness*

Section 81.005 authorizes an award of "reasonable" attorney's fees. The factfinder's starting point for calculating an attorney's fee award is determining the reasonable hours worked multiplied by a reasonable hourly rate, and the fee claimant bears the burden of providing sufficient evidence on both counts. *See Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 498 (Tex. 2019); *El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 760 (Tex. 2012). Sufficient evidence includes, at a minimum, evidence of (1) particular services performed, (2) who performed those services, (3) approximately when the services were performed, (4) the reasonable amount of time required to perform the services, and (5) the reasonable hourly rate for each person performing such services. *Rohrmoos Venture*, 578 S.W.3d at 498.

Here, Nilsson's attorney, Mary Ramos, briefly testified at trial and also introduced an affidavit, resumes showing her and her associates' experience, and dozens of pages of billing records. Sylvester's attorney did not cross-examine Ramos nor challenge any part of the documentary evidence. In other words, Sylvester did not contest a single aspect of the attorney's fees sought by Nilsson in the trial court.

After reviewing the record, we conclude that Nilsson's unchallenged evidence thoroughly addressed all the *Rohrmoos Venture* factors. In her affidavit, Ramos declared that she had practiced law in Texas since 2004 and was board-certified in family law. Ramos testified that:

> "[t]he service [she] provided was necessary and the amount that [she] charged for the service was reasonable at the time and place that the service was provided;"

> "[t]hese attorneys, paralegals and legal assistants have the experience which justifies their hourly rates;" and

14

"[t]he hourly rates are reasonable, necessary and customary for fees charged in this family law matter."

Specifically, in determining the reasonableness and necessity of the fees charged, Ramos considered the "time and labor required, the novelty and difficulty of the questions involved and the skill required to perform the legal services properly," as well as "the fees customarily charged in the locality for similar legal services for the complexity of the issues raised, argued and pursued." Ramos specified the billing rates charged by each attorney or paralegal who worked on the case, as well as the total number of hours worked.

Ramos substantiated the hours worked with detailed, contemporaneous billing records. The billing records were itemized both by practitioner (whether Ramos, an associate attorney, or a paralegal) and by task and were calculated by each practitioner's respective billing rate multiplied by tenths of an hour worked.

We hold that there is legally sufficient evidence to support the reasonable attorney's fees awarded by the trial court. *Rohrmoos Venture*, 578 S.W.3d at 498.

2. *Segregation*

Sylvester also argues that Nilsson failed to segregate his attorney's fees incurred in this proceeding from fees incurred in other aspects of his legal proceedings with Sylvester. Sylvester contends that "[t]he fees he presented are for all of his attorney's work not just the work performed on the second protective order application." Sylvester does not point to any evidence to support this assertion.

Of course, Nilsson can recover fees from Sylvester, the non-prevailing party, only if there is specific statutory or contractual authority allowing it, *see id.* at 487, and he must segregate his recoverable attorney's fees from any that relate solely to a claim for which fees are unrecoverable. *See Tony Gullo Motors I, L.P. v. Chapa*,

15

212 S.W.3d 299, 313 (Tex. 2006). As stated above, section 81.005(a) authorizes Nilsson's recovery of fees in these circumstances. *See* Tex. Fam. Code § 81.005(a). But Nilsson can recover only his fees incurred in obtaining the protective order against Sylvester, not for any other independent matter, such as the parties' divorce proceeding. *Tony Gullo Motors*, 212 S.W.3d at 313.

The exhibit containing Ramos's affidavit and the attached billing records that pertain to the legal services rendered in this protective order proceeding also contains testimony and evidence pertaining to Ramos's representation of Nilsson in the pending divorce proceeding between Nilsson and Sylvester. In her affidavit, Ramos asserted that Nilsson incurred $49,375.83 in the divorce matter and $45,179.84 in the protective order proceeding, and she attached billing records for both matters.[5] Although Ramos references fees incurred in the divorce—which Nilsson undisputedly may not recover from Sylvester under section 81.005(a)— there is no indication that Nilsson sought, nor that the trial court awarded, any fees for the divorce matter. Ramos distinguished between fees incurred in the divorce matter and fees incurred in the protective order proceedings, seeking recovery only for the latter.

Accordingly, our review of the record reveals that Nilsson sought, and the trial court awarded, fees incurred solely on this protective order proceeding. Specifically, the billing records that Nilsson introduced to substantiate the claimed fees specifically reference Nilsson's name, the trial court cause number in this case, and the reference "PROTECTIVE ORDER." The fees billed by Ramos and others in her firm under this cause number total $45,179.84, which is precisely

---

[5] We see no explanation in the record as to why Ramos included both matters in a single exhibit, but, regardless, Sylvester did not object to the admission of this evidence in the trial court.

what the trial court awarded.  Thus, Nilsson's fees were properly segregated, and Sylvester's segregation challenge fails.

3. *Ability to Pay*

Section 81.005 provides that, in setting the amount of attorney's fees, "the court shall consider the income and ability to pay of the person against whom the fee is assessed."  Tex. Fam. Code § 81.005(b).  Sylvester argues that there is no indication in the record that the trial court did so and that the award therefore must be reversed.

This court has held that section 81.005 "creates a divided burden of proof on the issue of the amount of attorney's fees to be assessed in a family violence protective order case."  *Ford v. Harbour*, No. 14-07-00832-CV, 2009 WL 679672, at *6 (Tex. App.—Houston [14th Dist.] Mar. 17, 2009, no pet.) (mem. op.).  Nilsson, as the applicant for a family violence protective order that includes a request for attorney's fees, had the initial burden to ask for and then put forward competent evidence proving he incurred reasonable attorney's fees as a result of applying for and prosecuting his application for a protective order.  Tex. Fam. Code § 81.005(a).  Then, pursuant to subsection (b), Sylvester had to come forward, not with evidence contesting the amount of attorney's fees incurred by Nilsson or even denying the reasonableness of those fees, but with evidence addressing her ability to pay the attorney's fees sought by Nilsson.  *Id.* § 81.005(b).  Because Sylvester's burden under section 81.005(b) is not to deny the fees incurred by Nilsson, but to avoid being assessed some or all of those fees because of an independent reason—i.e., her inability to pay—the burden is in the nature of an affirmative defense.  *Ford*, 2009 WL 679672, at *6 (noting that this division of the burden of proof also makes logical sense because "it imposes the burden of proof on the party with the best access to the required information").  Therefore,

Sylvester had the burden to come forward with evidence on that subject if she wanted the trial court to consider her ability to pay any assessment of Nilsson's claimed attorney's fees. *Id.*

In support of the attorney's fees sought by Nilsson, Ramos testified in general terms regarding the number of hours worked by each person in her firm, as well as their respective billing rates. Ramos also introduced detailed billing records. Sylvester offered no controverting evidence and did not cross-examine Ramos. Sylvester also failed to offer any evidence as to her inability to pay an assessment of attorney's fees. Therefore, we hold that Sylvester failed to raise the issue of an inability to pay Nilsson's attorney's fees in the trial court. *See id.*

4. *Double Recovery*

According to Sylvester, the fee award in the judgment is ambiguous and could be construed to award a double recovery. Sylvester therefore asks that we modify the fee award to clarify that she does not owe two separate amounts of $45,179.84 (once to Nilsson and once to Ramos).

We disagree that the judgment as written could support a double recovery. The judgment states:

> It is further ORDERED and assessed against Respondent, MELISA SYLVESTER, the sum of forty-five thousand one hundred seventy-nine dollars and eighty-four cents ($45,179.84) for reasonable attorney fees for obtaining this order. It is Ordered that Respondent, MELISA SYLVESTER, shall contact (and make payments to) the Ramos Law Group, PLLC, 1214 Miramar Street, Houston, Texas 77006, Ph: 713-225-6200, to make payment arrangements or the 280th District Court hereby ORDERED payments to be made as follows:
>
> It is ordered that Bjorn Nilsson is awarded a judgment in the amount of $45,179.84 for legal services rendered, against Melisa Sylvester, for which let execution issue. It is ordered that Melisa Sylvester pay

18

$__x__ per month, beginning __x__, and due every month until paid in full. Respondent further agrees to a wage withholding order to issue once she begins working and will notify Bjorn Nilsson of any employers within 3 days of any change in employment status, so that he may cause a wage withholding order to issue.

Melisa Sylvester is ordered to pay $45,179.84, lump sum on or before Nov. 1, 2019, 5:00 p.m.

It is clear from the judgment that Sylvester is responsible for $45,179.84 for the "legal services rendered" to Nilsson, and that she must pay those fees to Ramos. If Sylvester fails to make payments to Ramos, then Nilsson is entitled to obtain a wage withholding order to satisfy the fee award. There is no ambiguity in the judgment, nor does the judgment permit a double recovery of attorney's fees.

5. *Fees as Part of the Protective Order*

Sylvester's last challenge to the fee award is her argument that the fee award cannot stand if we reverse the trial court's order of protection. Because we are affirming, not reversing, the trial court's order, this argument presents no basis for reversing the fee award.

For all of the above reasons, we overrule Sylvester's third issue on appeal.

**Conclusion**

We affirm the trial court's protective order.


/s/     Kevin Jewell
        Justice


Panel consists of Justices Jewell, Poissant, and Wilson.